Harry B. Frank, J.
This action is brought for the recovery of moneys claimed as due under the divisible surplus feature of a group hospital and surgical policy issued by the defendant, Metropolitan Life Insurance Company, a mutual insurance company incorporated under the laws of this State. The unusual *618 fact pattern and the somewhat cryptic pleading of the canse of action on which the case is founded reflect some of the peculiar problems which can stem from the group insurance arrangement.
The policy involved was originally issued by the defendant on June 22, 1951 to Ditto Incorporated, a Delaware corporation with main offices in Chicago, Illinois, and provided coverage for specified personal and dependent hospital and surgical benefits. While Ditto, as employer, was named as the policyholder, the policy undertook to insure those of Ditto’s employees who met certain eligibility requirements and who enrolled thereunder. Upon becoming insured, the individual employee received a separate certificate which set forth the nature of his coverage and the essential terms of the “ Master Policy ” issued to Ditto. Premiums were paid under a ‘ ‘ contributory ’ ’ plan whereby the individual employee and Ditto equally shared the cost of the particular coverage.
Section 17 of the Master Policy, in compliance with the mandate of section 216 of the Insurance Law of New York, provided for participation in divisible surplus as follows : “Participation and Divisible Surplus — This Policy is a participating contract and the Insurance Company shall annually ascertain and apportion any divisible surplus accruing under policies of this class.” At the time of the issuance of the hospital and surgical policy, a group life insurance policy previously issued by Metropolitan to Ditto had been in effect for some time, and provision was made for combining the financial experience under both policies for purposes of determining any divisible surplus thereunder.
When the hospital and surgical policy first went into effect, it operated under what was known as the * ‘ tabulation system. * ’ Under this system Metropolitan maintained a “ Register ” at its office consisting of a file containing the enrollment cards of all Ditto employees who were insured under the policy, upon which were noted all information relevant to the particular individual’s coverage. Ditto, who kept a similar set of cards, notified Metropolitan of any changes affecting the various employees and Metropolitan adjusted the Register accordingly. Certificates to new enrolees were issued by Metropolitan upon receipt of the appropriate card from Ditto and such certificates were in turn sent back to Ditto for ultimate delivery to the employee. This method of operation was in accordance with the provisions of section 15 of the policy, as originally issued, which required the insurance company to keep the Register and *619 to furnish a copy thereof, and copies of all subsequent entries therein, to the employer. Under the tabulating system, premium billings were prepared monthly by Metropolitan from its cards, and statements thereof were sent to Ditto. These statements contained an IBM listing of every currently insured employee, with the applicable premium for each, and in Ditto’s case such statements included more than a thousand listings each month.
It is quite evident that the tabulation system involved a duplication of effort and imposed extensive clerical burdens upon Metropolitan which were necessarily reflected in its expenses of administering the policy. Since the procedure had been found to be cumbersome in various ways, and since Metropolitan’s administrative expenses were related to the actual cost of the insurance, Ditto was amenable to changing an alternate method of operation known as the “ Simplified Accounting System.” The changeover was accomplished by an amendment of the policy, effective September 16, 1951, whereby the obligation to maintain the Register, under section 15, fell upon Ditto, rather than Metropolitan, "with Metropolitan being given the right to audit the records at regular intervals. The original Register was thereafter transferred to Ditto’s office and from that time on any necessary changes in the Register were made by Ditto itself without any notification to Metropolitan. Under the new system Metropolitan had no records at all in its office showing the identity of those Ditto employees who were insured under the policy, nor was there any provision in the amended policy requiring that such information be turned over to it. Indeed, Metropolitan’s complete disinvolvement from such details was the very purpose of the changeover. As part of this new procedure, blank certificates were provided and such certificates were issued by Ditto itself directly to new employees who enrolled under the policy. Moreover, Ditto computed and remitted the amounts of the premiums due under the policy by applying the applicable rates to the number of employees shown by its records to be covered. The periodic audits by Metropolitan’s employees appear to have been made only for the purpose of checking the accuracy of such premium remittances.
Insofar as claims were concerned, the policy provided that benefits should ‘ ‘ be paid to the Employee as they accrue upon receipt of written proof covering the occurrence, character and extent of the event for which claim is made.” The procedure on filing claims remained the same after the changeover as it was prior thereto. Claim forms were provided by the defendant *620 to the employer from whom they could be obtained by the individual employees. The form was divided into four sections, one of which was to be filled in by the insured employee making the claim, a second section which was to be completed by the employer attesting to the claimant’s employment and coverage under the policy, and the remaining sections were to be completed by the physician and hospital affording the treatment for which the claim was being made. Upon completion of the entire form it was returned to the employer who forwarded it to Metropolitan’s office where it was processed. Payment was made by Metropolitan, at the employee’s option, either directly to the medical facility involved or by check payable to the insured. In the latter event, the check was sent to Ditto for delivery to the individual employee. The proof indicates that when the claim forms were received by Metropolitan they were examined to ascertain whether each of the pertinent sections was completed, and, where the forms appeared proper and regular on their face, payment was normally issued without any further specific investigation as to the authenticity of the medical proof beyond an occasional check of medical and hospital directories to confirm that the physicians and hospitals involved were duly authorized medical authorities. Only where a particular claims form suggested some irregularity was a more extensive investigation undertaken. The proof indicated that great stress was attached to the employer’s information regarding employment and coverage since the company relied thereon.
With this general background, the stage is set for the introduction of the main player of the drama that subsequently unfolded. From 1948 on, Ditto had in its employ one Anna Marie Henning, a clerical employee who worked under the direction and supervision of Mr. Kenneth Hugg, Ditto’s director of industrial relations and the person in charge of the employee insurance programs. Miss Henning, as part of her duties, had handled whatever clerical work was necessary in connection with the company’s group life insurance program. Her services in that regard were satisfactory, and, accordingly, when the hospital and surgical policy was added she was assigned to handle the necessary details under that policy, as well. Miss Henning and her superior, Mr. Hugg, were the primary Ditto personnel with whom Metropolitan had contact relative to Ditto’s insurance programs, and Ditto, in writing, advised Metropolitan of Miss Henning’s authority in connection with matters pertaining to the policies. She handled all correspondence with Metropolitan and, in turn, any manuals, informa *621 tian or instructions provided by Metropolitan’s agents were directed to her. It was Miss Henning who kept and maintained all the records in Ditto’s office pertaining to the policies, both before and after the procedural changeover, and after the change she was the one who issued certificates to new enrollees and who computed the premiums due. She also kept a claims book, for Ditto’s convenience, in which a record was kept of all claims filed under the policies.
The Simplified Accounting Procedure held for Miss Henning that same irresistible attraction as the fatal apple in Eden which lured Eve to her downfall. Recognizing that under the new system Metropolitan no longer had access to any records showing the names or certificate numbers of the specific employees enrolled under Ditto’s group policy, all such records being safely in Ditto’s office under her care, Miss Henning quietly undertook to supplement her income by the filing of fictitious claims. Her modus operandi was ingeniously simple and required no accomplices beyond an assortment of pens which she deftly manipulated with an apparently hitherto dormant creativity. Using a standard claims form, she would complete the employee’s portion thereof in a disguised handwriting and using some fictitious name and address that happened to appeal to her, but making certain to insert in the appropriate space a legitimate certificate number then in effect. Using some different pen and script she would complete the medical portions of the claim by forging the names of approved doctors and hospitals actually in existence but, of course, giving a fictitious history of treatment, and always utilizing the option for payment to the claimant rather than to the physician or hospital. In the remaining portion of the form which was to be completed by the employer, Miss Henning, using her normal handwriting and signature as Ditto’s representative, certified fictitious information relative to the employment and insurance coverage of this nonexistent employee in much the same way as she did, and was authorized to do, in the case of claims filed by legitimately covered employees, and, as thus completed, she forwarded the claim form to Metropolitan as she would any ordinary claim. She did not, however, enter these claims in the claim Register kept by her for the office. From 1952 up to 1959 Miss Henning submitted some 230 fraudulent claims for which checks totaling almost $50,000 were remitted to her by Metropolitan for delivery to the fictitious employees. She, of course, cashed these checks upon forged indorsements and pocketed the proceeds.
*622 Miss Henning’s comfortable little enterprise came to an abrupt end in 1959 and the discovery of her scheme led to an indictment for forgery to which she pleaded guilty. No restitution of the funds has been made.
During each of the years that the fraudulent claims were paid, Ditto received from Metropolitan payments representing the divisible surplus apportioned to its policy for such year. One of the primary factors in the computation of such apportionment was the experience, or claims, under the policy during the particular year involved, and from 1952 to 1959 Ditto’s experience figures included the claims subsequently found to have been fraudulent. When the full extent of Henning’s frauds became known, Ditto obtained from Metropolitan certain calculations which indicated that if such fraudulent claims were excluded, Ditto’s total divisible surplus for the seven-year period would have been $235,909, or some $49,108 more than the amount which was actually apportioned and paid. Ditto’s demand upon Metropolitan for payment of such additional sum was refused, and Ditto subsequently made a claim therefor under its blanket crime policy with the plaintiff herein, the Fidelity and Casualty Company of New York, which covered any losses sustained through the dishonest acts of employees. Plaintiff made payment upon such claim, but as a condition thereof it received a purported assignment of any claim which Ditto had against the defendant due to the dishonest acts of Henning, and the instant litigation followed.
The complaint herein affords minimal enlightenment as to the nature of the cause of action upon which plaintiff seeks a recovery. At the trial, plaintiff admitted its evasiveness in pleading and specified for the record that it was suing as assignee of Ditto’s cause of action for an alleged breach of contract in connection with the apportionment of divisible surplus under section 17 of the policy. However, the nature of the alleged breach has never been clearly defined beyond the contention that the total amount of divisible surplus which should have been apportioned to Ditto under the terms of its policy, and which in fact became due on its policy during the seven years involved, was the sum of $235,909, of which only $186,760 has been paid, ‘‘ leaving a balance in defendant’s hands of $49,149 ’ ’ which defendant has wrongfully retained and to which extent defendant has been unjustly enriched.
A clarification of the issues in this case requires some understanding of the operational methods of a mutual insurance company such as ¡the defendant, the relationship between such *623 company and its policyholders, and the essential character of divisible surplus.
A mutual insurance company is a co-operative enterprise in which the policyholders constitute the members for whose benefit the company is organized, maintained and operated (see Penn Mut. Co. v. Lederer, 252 U. S. 523; 29 Am. Jur., Insurance, p. 504, § 89; Insurance Law, § 57). As an incident of membership in such company, the policyholder acquires certain specified proprietary interests therein, but, apart from these, the relationship is not of a fiduciary nature nor is the policyholder in any sense a partner of the corporation, and the relationship between the company and its policyholder is essentially that of debtor and creditor measured by the contractual terms of the policy (see Uhlman v. New York Life Ins. Co., 109 N. Y. 421; Cohen v. New York Mut. Life Ins. Co., 50 N. Y. 610; Clifford v. Metropolitan Life Ins. Co., 264 App. Div. 168. Cf., also, New York Hotel Ins. Fund v. Prudential Ins. Co., 1 Misc 2d 245, affd. 1 AD 2d 952; Siegel v. Prudential Ins. Co., 286 N. Y. 618; Equitable Life Assur. Soc. v. Brown, 213 U. S. 25).
Absent any contractual provisions to the contrary, the moneys paid as premiums on the policy are solely in consideration of the insurance bargained for and upon payment thereof no title to the money remains in the policyholder, but it belongs to the company outright, and the management of such funds, except as limited by statute, is confined to the company’s judgment, discretion and skill (see Uhlman v. New York Life Ins. Co., supra; Insurance Law, § 56; Watts v. Equitable Life Assur. Soc., 55 Misc. 454; cf. New York Hotel Ins. Fund v. Prudential Ins. Co., supra).
A mutual company, having no capital stock, is compelled to rely solely upon its premiums to fulfill its policy obligations and to meet unexpected losses and contingencies, and in order to provide a margin of safety its premium rates must necessarily be greater than the expected cost of the insurance promised. As a consequence, such companies generally follow a procedure whereby the amount of the premium reflects the cost of the risk, that is, anticipated losses under the policy, and includes, in addition, certain “ loading ” charges to cover the expenses of conducting the business and to provide for unforeseen contingencies. Such initial premium represents merely the estimated cost of the policy and it is expected to provide a surplus if the company is well managed and its risks prudently selected. (See Rhine v. New York Life Ins. Co., 273 N. Y. 1; Penn Mut. *624 Co. v. Lederer, supra; New York Life Ins. Co. v. Bowers, 283 U. S. 242; Mutual Benefit Life Ins. v. Herold, 198 F. 199.)
Since a mutual company is operated wholly for the benefit of its policyholders, its functions to provide insurance at cost rather than to amass profits in the ordinary business sense. While the initial premium paid by the policyholder usually represents a somewhat inflated estimate of the cost of the policy, at the end of the year when such cost is actually ascertained, the company is required to return to its policyholders the excess premium, that is the amount in excess of the company’s actual cost. (See Rhine v. New York Life Ins. Co., supra; Penn Mut. Co. v. Lederer, supra.) Such return is accomplished by means of a distribution of the ‘1 divisible surplus ’ ’ in accordance with the mandate of section 216 of the Insurance Law. The distribution of divisible surplus is in reality an adjustment of the premium in retrospect of the amount found to have been actually necessary to cover the contingencies which materialized and it effects a reduction in the cost of the insurance. (Kern v. John Hancock Mut. Life Ins. Co., 8 A D 2d 256, affd. 8 N Y 2d 833.)
While the distribution of available surplus to policyholders in a mutual company is mandatory, the extent of the policyholder’s rights and the company’s obligation with regard to such distribution is governed by the terms of the policy and the applicable statutes (see Menin v. New York Life Ins. Co., 188 Misc. 870; Scholem v. Prudential Ins. Co., 172 Misc. 664).
Section 216 of the Insurance Law proscribes the manner in which the company is to “ ascertain and distribute annually ’' the proportion of any surplus accruing upon every participating policy. The company is directed to calculate the surplus earned by it during the year and, after making authorized deductions wherein a limited degree of discretion may be exercised, it is commanded to “ apportion the remainder of such earnings, if any,” equitably to all policies entitled to share therein. (See Kern v. John Hancock Mut. Life Ins. Co., supra.) Such “ remainder ” constitutes the company’s total divisible surplus for the year, that is, all the funds which it has available for distribution to policyholders in repayment of excess premium charges. It is a definitive delineation of the over-all amount which is owed by the company to its participating policyholders, in the aggregate (cf. Watts v. Equitable Life Assur Soc., 55 Misc. 454, supra; Brine v. Public Serv. Mut. Cas. Co., 273 App. Div. 288; also, see, Lubin v. Equitable Life Assur. Soc., 326 111. App. 358, for an excellent analysis of surplus funds generally and policyholders’ rights therein). The extent of *625 the individual policyholder’s rights in such fund is set forth in section 57 of the Insurance Law which provides that each policyholder is entitled ‘ ‘ to share equitably in the dividends if and as declared by the board of directors ”, and such directors are instructed to declare and pay such dividend in such manner as shall be fair and equitable to the policyholders, although they are specifically prohibited from paying a dividend if the minimum or other required .surplus of the company will be impaired thereby. The policy itself merely provides that the company shall “ annually ascertain and apportion any divisible surplus accruing under policies of this class.”
The net effect of the policy and applicable statute was to give Ditto, as the policyholder, the right to share equitably in the distribution of the company’s divisible surplus (cf. Rhine v. New York Life Ins. Co., 278 N. Y. 1, supra; Uhlman v. New York Life Ins. Co., 109 N. Y. 421, supra).
In light of practical considerations, the company is afforded a great measure of discretion in the apportionment of the divisible surplus among the various policies entitled to share therein, and its apportionments are prima facie deemed equitable (see Rhine v. New York Life Ins. Co., supra; Barnett v. Metropolitan Life Ins. Co., 258 App. Div. 241, affd. 285 N. Y. 627; Ann. 108 A. L. R. 1212, Divisible Surplus — Apportionment). The record herein, while lacking in specifics, indicates that the defendant apportioned divisible surplus in accordance with the “ contribution ” method in general use, the mechanics of which are discussed at length in Rhine v. New York Life Ins. Co. {supra). Under such scheme, the company aims to apportion the surplus amongst its policyholders in the same proportion as the policyholders by their payments have contributed to that surplus, or stated somewhat differently, the policyholders are to receive back the excess premiums over the cost of furnishing that particular type of insurance. In applying the ‘£ contribution ’ ’ method, the company does not attempt to determine the exact amount which each policyholder has contributed to the divisible surplus. Instead, policies are divided into classes or groups based upon variation in some factor which entered into the computation of the anticipated cost of furnishing the insurance when the premium is fixed or into the computation of the actual realized cost when the divisible surplus is apportioned; and it determines the amount which should be returned to the policyholders of each group or class accordingly {Rhine v. New York Life Ins. Co., supra, p. 10; see, also, Insurance Law, § 57, subd. 1, which specifically permits such classifications for dividend purposes).
*626 Upon application of the foregoing fundamentals, it becomes possible to decipher the real nature of plaintiff’s claim, which both parties have rendered obscure by a persistent involvement, in the abstract, with the diverting fact pattern here present unrelated to the meaning of divisible surplus and the extent of Ditto’s rights thereto.
During each of the years involved herein, the defendant had available divisible surplus funds which it apportioned among its policyholders, but the specific amounts thereof and other relevant particulars were not submitted. The plaintiff raised no question as to the sufficiency of the over-all annual sums which the defendant allocated to divisible surplus, nor did it put in issue the propriety of the share of such divisible surplus fund which was apportioned to Ditto’s class, as a whole; and, consequently, such allocations and apportionments must be deemed proper. Moreover, where such issues are raised, that is, where the directors are charged with abuse of discretion in the manner in which they computed the dividend and relief is sought to compel them to declare the dividend in some other manner than the formula which they adopted, the only remedy is a suit in equity on behalf of all others similarly situated. (See Kern v. John, Hancock Ins. Co., 8 A D 2d 256, supra, and cases therein cited:)
Plaintiff’s claim, then, reduces itself to the following: that while the share of available divisible surplus which was annually apportioned to Ditto’s class in the aggregate was proper, the particular share of surplus which was apportioned to Ditto individually during the period involved was some $49,108 less than the amount to which it was entitled under its contract of insurance and constituted a breach thereof. Such claim, however, must be measured in the context of the contractual right actually possessed by Ditto which was that of sharing equitably in the distribution1 of available divisible surplus. The actual apportionments of such surplus as made by the company must be regarded prima facie as an equitable apportionment and the policyholder has the burden, at the outset, of establishing by competent proof that such apportionment is inequitable or improper. To succeed, plaintiff must show that the principle on which the apportionment is based is so clearly erroneous as to be beyond the exercise of any reasonable discretion on the part of the company’s directors. (See Rhine v. New York Life Ins. Co., 248 App. Div. 120, affd. 273 N. Y. 1, supra; Uhlman v. New York Life Ins. Co., 109 N. Y. 421, supra; Barnett v. Metropolitan Life Ins. Co., 258 App. Div. 241, affd. 285 N. Y. 627, supra.) Although couched in abstruse terms *627 which skillfully circumvent these fundamental considerations, the plaintiff’s cause of action must be construed as charging that the shares of surplus actually distributed to Ditto were inequitable, and proof thereof is essential to any right of recovery on its part. Since plaintiff has adopted the accuracy of the over-all share of surplus which was apportioned to Ditto’s class as a whole, the charge can further be particularized as one of equitable apportionment within a class, that is, that Ditto did not receive its fair and equitable share of the total divisible surplus funds which were allocated to its class during each of the years involved.
It may be noted that the various precedents herein cited have primarily dealt with equitable apportionment as affecting an entire group or class of particular policyholders in distinction to the equitability of the apportionments inter se such particular class or group, but the principles enunciated are equally relevant to the latter .situation. (Cf. Kern v. John Hancock Ins. Co., 8 A D 2d 256, supra.)
The statutory test of equitable apportionment within a class is set forth in section 209 of the Insurance Law which prohibits the company from unfairly discriminating between individuals of the same class. (Of., also, Rhine v. New York Life Ins. Co., 248 App. Div. 120, supra.) Comparison is the determinant of discrimination. In this instance, therefore, it would be necessary to have available those specific facts and figures relating to the distribution of surplus among the members of Ditto’s class as would make possible a comparison of Ditto’s treatment therein in relation to the remainder of the group. No such evidence was submitted. There is nothing in the record to show the size of the class, the specific amounts of the aggregate annual class apportionments, the extent to which Ditto shared therein as compared to the other members of the class, the various factors used in determining the share of surplus which each member was to receive, or the manner in which such factors were applied to the members other than Ditto, particularly the experience factor. The only proof submitted were records which related solely to Ditto’s share of divisible surplus and the various charges involved therein. Such figures, however, afford no basis for any comparative analysis with the remainder of the group and plaintiff has failed to present any facts which would substantiate discriminatory or inequitable treatment.
In lieu of appropriate proof to establish that the apportionments made to Ditto were not equitable, the plaintiff has instead attempted to affirmatively establish the amount of divisible *628 surplus to which Ditto was allegedly entitled. It concludes that defendant improperly charged Ditto with Henning’s fraudulent claims in the computation of its share of surplus and, therefore, the proper share which should have been apportioned to Ditto was such amount as would have been apportioned to it upon disregard of such claims. The precise figures which the plaintiff relies upon are based upon hypothetical computations which defendant made available to Ditto prior to the institution of this • action. The record clearly indicates that such figures are predicated upon a hypothesis which assumes that the frauds had not in fact taken place, which, of course, would mean that defendant never disbursed the funds involved. While such theoretical calculations might suffice for purposes of a recovery by Ditto under its policy with plaintiff covering direct or indirect losses occasioned by the forgery of an employee, they are meaningless in this litigation. The crucial factor herein is that the frauds very definitely did take place and that the defendant actually disbursed moneys in payment of such fraudulent claims. The payments which were made on such claims, irrespective of their merit, were expenditures which operated to decrease the assets of the defendant company and to diminish the amount of its earnings and surplus to exactly the same extent as though such claims were as legitimate as they originally appeared. The discovery of the fraudulent character of such claims did not increase by one cent the total amount of surplus which was available to the members of Ditto’s class. Its class apportionment, moreover, was predicated upon calculations which included such claims in the cost of furnishing the class insurance. Since such class apportionment is accepted by Ditto, its equitable share thereof must necessarily be based upon the actual amounts of such total class apportionment and upon acceptance of the contested claims payments as a valid class cost factor if not a valid individual charge. The theory asserted by plaintiff as to the “ equitable ” apportionment predicated upon a nonexistent base which includes funds which defendant did not in fact have available has no relevance whatsoever and is merely an interesting arithmetic computation.
Since plaintiff’s charge of improper apportionment is posited upon the inclusion of Henning’s claims as part of Ditto’s experience factor in the calculation of its share of surplus, its claim can be disposed of within that framework. At the outset, it may be noted that this action is an outgrowth of the peculiarities inherent in the group insurance arrangement. Unlike the *629 ordinary policy situation where the policyholder is also the insured, the group insurance policyholder is the employer who merely derives certain incidental good will benefits in his relationship with his employees by virtue of the policy, but he is neither the insured nor the beneficiary of the coverage which the contract of insurance undertakes to provide. It is, instead, the employees who are the insureds and who directly benefit under the terms of the policy. Thus, in a group policy there are really three interested parties — the insurer, the employer who is the policyholder, and the employees who are the actual insureds covered by the policy. Since the employer policyholder acquires only peripheral benefits, it is to be expected that he will be most concerned with obtaining the insurance at the lowest possible cost. The employee insureds, on the other hand, will be more concerned with the protective aspects of the policy.
Plaintiff asserts that defendant was under an obligation to investigate the medical claims .submitted in a manner beyond what was here done in order to verify their authenticity before making payment thereon, and that defendant’s failure to do so constituted a breach of its policy obligations by reason of which the payments made on such claims may in no way be reflected in the calculation of Ditto’s share of divisible surplus. Plaintiff pithily .suggests in its brief that since defendant has amassed huge profits because of its failure to provide adequate investigation facilities, it alone must bear any losses resulting therefrom.
Insofar as plaintiff suggests that defendant may not, in any way, charge off these claims payments as a cost of providing insurance, it has chosen the wrong forum. If it is seriously suggesting that such payments could not be deducted in ascertaining the over-all divisible surplus fund and the aggregate share of such fund which was to be apportioned to Ditto’s entire class, its only available remedy is an appropriate, although unlikely successful, action in equity (see Kern v. John Hancock Ins. Co., supra). In this action which is based upon a breach of contract, plaintiff must accept those determinations as actually made by the defendant and may only recover Ditto’s prorata share in accordance therewith (see Greeff v. Equitable Life Assur. Soc., 160 N. Y. 19).
Thus, in this action, while there is no question that defendant was authorized to charge .such claims off as a cost factor in determining available divisible surplus, the only real question is whether or not in the ultimate apportionments of such sur *630 plus it was equitable to charge the entire burden thereof against Ditto’s individual share, rather than to perhaps treat it as a general class expense.
As to supposed obligations on the part of defendant to. utilize particular investigative procedures, there is nothing in the Master Policy, which is the controlling contract of insurance herein, to support the plaintiff’s allegations in that regard. Plaintiff seems to imply that some fiduciary relationship exists between the employer and company to protect the former from any fraud on the part of its employees, including insureds, since the theory herein would apply equally to legitimately covered employees who submitted fraudulent claims. The contract of insurance herein was not entered into for the purpose of purchasing any particular type of investigation, or for any investment purposes insuring the employer a particular return by way of divisible surplus. Despite the employer’s limited beneficial interest therein, the policy was purely and simply the purchase of protection and benefits in return for a stipulated premium. There was no obligation whatsoever upon defendant to treat Ditto’s moneys as trust funds, nor to perform its insuring obligations within any limitations specifically related to Ditto’s share of surplus. Defendant was obliged to provide the protective services which were the very essence and dominant purpose of the policy, and this it did. (Cf. New York Hotel Ins. Fund v. Prudential Ins. Co., 1 Misc 2d 245, supra.) The manner in which defendant performed those services was a matter of business judgment within the discretion of its management. Proof was submitted to indicate that any procedure involving intensive investigation of claims would have been prohibitive in terms of cost thereby defeating the entire economy basis underlying the group insurance arrangement, and that the method used, while it assumed the risk of a certain number óf fraudulent claims, was the most economically feasible. Ditto’s substantial annual divisible surplus returns, despite the fraudulent claims, is perhaps the most telling affirmance of the merit of defendant’s business judgment in this regard.
If plaintiff seeks to contest such business operations and to charge the directors with misfeasance or waste and mismanagement, it may not do so in this breach of contract action for recovery of an allegedly equitable share of surplus. If at all, such must be litigated in an appropriate derivative action comparable to that brought by a stockholder for similar relief. (See Garfield v. Equitable Assur. Soc., 7 Misc 2d 283; but, cf. Equitable Life Assur. Soc. v. Brown, 213 U. S. 25, supra.)
*631 The factual presentation herein not only fails to establish any impropriety or inequitable treatment such as would constitute an abuse of discretion by defendant in its apportionments of divisible surplus to Ditto, but instead affirmatively demonstrates to the contrary. Ditto’s involvement in the procedural operations of the policy herein was in its capacity as the policyholder, and not as some disinterested party unrelated to the insurance contract. Insofar as Ditto undertook to act for its employees in connection with the administration of the policy, it stood in their shoes (see Boseman v. Insurance CCo., 301 U. S. 196; Duval v. Metropolitan Life Ins. Co., 82 N. Y. 543), and in the context of the contract of insurance their combined interests were adverse to those of the insurer (see Longley v. Prudential Ins. Co. of America, 161 S. W. 2d 27 [Mo.]). When Ditto undertook the obligation of maintaining the “ Register ” it was not an act of noblesee oblige, but was undertaken, as Mr. Hugg clearly testified, for the economic benefits which would inure to it by virtue of reduced administrative expenses. Once Ditto assumed these procedural obligations, for its own interests, Metropolitan no longer had available any records relating to specific employee coverage. Ditto, and only Ditto, had control over that information. Consequently, after the changeover of records took place, the information relative to coverage which was to be supplied by the employer took on especial significance, no alternative source of such information being available to Metropolitan. When the authorized employee of Ditto, and there is no question that Miss Henning was fully authorized for such purpose, submitted data relative to coverage and employment, it was information that was submitted not by a disinterested stranger but by the policyholder itself. Under such circumstances, Metropolitan was entitled in good faith to rely upon such information as it did. (See Schwartz v. Mutual Benefit Life Ins. Co., 28 Misc 2d 367, affd. 14 A D 2d 754; cf. Hanna v. Mt. Vernon Life Ins. Co. of N. Y., 260 F. 2d 244.) The fact that further investigation might have disclosed the invalidity thereof is not important. Metropolitan had as a matter of business judgment determined that the most economic way of providing the coverage contracted for was by processing claims in a particular way. The normal risks involved therein were gouged, but essential to its operation was the right to rely upon its policyholder’s information. It was the seemingly proper employer’s certification of coverage that gave these particular claims the stamp of regularity and authenticity. Ditto alone gave Miss Henning the authority to submit such information and had advised the defendant of that *632 authority, and Metropolitan was entitled to treat such information as validly coming from its policyholder. These claims resulted in expenditures which were directly attributable to the cost of furnishing Ditto’s insurance specifically, and were properly reflected as such in determining the amount of surplus, or excess premium, to be apportioned on its policy. Any other treatment might well have constituted discriminatory treatment to the other members of the class.
Plaintiff places great stress upon defendant’s failure to discover the scheme upon examination of Ditto’s records. Such audits, however, were purely related to accuracy of premium payments and had no connection with any other matter. In that regard, it may be noted that Ditto itself maintained a claims book, solely for its own convenience, which reflected all legitimate claims made under the policy. Since Miss Henning did not enter the fraudulent claims therein, a simple annual computation of such claims would have disclosed the discrepancy between such figures and the experience figures submitted by Metropolitan. (Cf. Thomson v. New York Trust Co., 293 N. Y. 58.)
Since no recovery on behalf of Ditto is warranted, no disposition of the issues raised in regard to plaintiff’s status is necessary.
Upon the foregoing, I find in favor of the defendant, and the Clerk is directed to enter judgment accordingly.