**In re METLIFE DEMUTUALIZATION LITIGATION.**

No. CV 00–2258(TCP)(AKT).

United States District Court,
E.D. New York.

June 18, 2007.

Jared B. Stamell, John C. Crow, Stamell & Schager, L.L.P., New York City, for Plaintiffs.

Bruce E. Yannett, Carl Micarelli, Eric Daniel Meyer, Jeffrey Ehrlich Alberts, Debevoise & Plimpton LLP, Duncan J. Logan, Metropolitan Life Insurance Co., New York City, for Defendants.

Barry A. Weprin, Milberg Weiss Bershad & Schulman LLP, New York City, for Respondents.

## MEMORANDUM and ORDER

PLATT, District Judge.

Plaintiffs[1] appeal from an Order by U.S. Magistrate Judge Kathleen Tomlinson issued on March 30, 2007, denying plaintiffs' motions challenging MetLife's assertions of attorney-client privilege to communications between MetLife and its lawyers related to the preparation of MetLife's policyholder information materials sent to policyholders to seek their vote on MetLife's proposed reorganization from a mutual life insurance company to a stock life insurance company. For the following reasons, the Court grants plaintiffs' request to obtain the aforementioned communications.[2]

### Factual Summary

A thorough recitation of the facts may be found by reading this Court's prior decisions in this matter, *In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254 (E.D.N.Y.2001) and *In re Metlife Demutu-alization Litig.*, 322 F.Supp.2d 267 (E.D.N.Y.2004). Nevertheless, the Court will briefly recite a few essential facts. In April 2000, MetLife changed from a mutual life insurance company to a stock life insurance company, through a process known as demutualization. Pursuant to the demutualization, which was approved by 93% of the nearly 2,800,000 policyholders who voted, the policyholders exchanged their membership interests, such as the right to vote on matters submitted to them and the right to receive a portion of the surplus in the event that MetLife was liquidated, for beneficial interests in the MetLife Policyholder Trust ("the Trust"), which was established during the demutualization. The Trust held shares of the stock in the newly formed holding company, MetLife, Inc.

Plaintiffs claim that in connection with the policyholder vote that approved the demutualization, MetLife issued to each policyholder a Prospectus[3] which con-

---

1. Plaintiffs in this case are a certified class of 8.4 million policyholders or 78% of the policyholders entitled to vote on Metropolitan Life Insurance's ("MetLife") demutualization. *In re MetLife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y.2005). This Court defined the scope of the class to include "[a]ll persons who were participating Metropolitan Life Insurance Co. ("MetLife Co.") policyholders on or about September 28, 1999, for whom MetLife Co. calculated a positive actuarial equity share ("participating policyholders") and whose rights as participating policyholders were exchanged for shares of stock in MetLife Co., pursuant to defendants' plan of demutualization...." *Id.* at 372.

2. Subsequent to plaintiffs filing their objections to Magistrate Judge Tomlinson's ruling, defendants moved to strike numbered Parts 1 and 4 of Plaintiffs' Reply in Support of Plaintiffs' Objections to Magistrate Judge's Order. In Part 1 of their reply brief, plaintiffs asked this Court to dismiss MetLife's Twelfth Defense that "[w]ith respect to the claim under § 12(a)(2) of the Securities Act of 1933, defendants did not know, and in the exercise of reasonable care could not have known, of any untruth or misleading omission in the alleged prospectus." Plaintiffs' request for dismissal of the Twelfth Defense was based on the ground that such dismissal "protects plaintiffs from the prejudice that would occur if MetLife offered evidence at trial or in summary judgment to prove the § 12(a)(2) affirmative defense, after it blocked plaintiffs' discovery of what MetLife and the Prospectus' authors and editors knew or could have known." In light of the Court's present ruling granting plaintiffs access to the requested documents, the arguments related to striking the Twelfth Defense are rendered moot. Also moot is defendants' request to strike Part 4 of Plaintiff's Reply Brief, asking MetLife to produce a report and related documents, since MetLife produced the requested information and plaintiffs subsequently withdrew that request.

3. The "Prospectus" is a collection of printed materials sent by MetLife to its policyholders in the fall of 1999. It includes "The Chairman's Letter," "Ballot and Personalized Information Cards," "Read Me First" brochure, "Policyholder Information Booklet Part One"

tained material omissions and misrepresentations about the effect the demutualization would have on participating policyholders' rights. Participating policyholders are those former MetLife policyholders who paid premiums that were intentionally priced higher in order to create a surplus. That surplus constituted a fund from which MetLife would return to participating policyholders the overcharges together with any accrued interest as a dividend payment. The demutualization extinguished the participating policyholders' rights to these dividend payments—with the exception of dividends paid out of a closed block of designated assets—in exchange for the rights as stockholders in a stock company.

Plaintiffs allege that as a result of the demutualization, and in exchange for their rights as participating policyholders, they "received only 54 ¢ on the dollar for their policies, that dividends were reduced, and that MetLife engaged in fraud by not stating this in the [Prospectus]." *In re Metlife Demutualization Litig.,* 322 F.Supp.2d at 269; Amended Compl. at ¶ 55(i). Specifically, plaintiffs allege that "MetLife allocated one $14.25 share of MetLife, Inc. to each participating policyholder for each $26 that such policyholder had contributed to the aggregate $15.34 billion of contributions to MetLife's surplus." (Amended Compl. at ¶ 55(g)).

Plaintiffs assert that MetLife made the following omissions and misrepresentations in the Prospectus: "(i) omitting to state that the actuarial method used to calculate policyholders' contributions to MetLife's surplus arrived at a value of $15,300,000,000, far higher than the $8,400,000,000 in stock that these policyholders received as compensation; (ii) omitting to state that MetLife's method

of reorganization, an exchange of polices for stock with the right to elect cash, as opposed to an exchange of policies for cash with the right to elect stock, was chosen for the benefit of MetLife and not the policyholders, because Plaintiffs would allegedly have received double the compensation under the latter method; (iii) omitting to state that policyholders would surrender their right to annual dividends from their contributions to MetLife's surplus; and (iv) misstating that reasonable dividends would 'continue to be paid as declared,' when in Plaintiffs' view the assets allocated to pay dividends had been limited." *See In re MetLife Demutualization Litig.,* 229 F.R.D. 369, 372 (E.D.N.Y.2005).

## Discussion

 We are concerned here with events and communications that took place prior to MetLife's demutualization process, when MetLife was a mutual life insurance company. Specifically, the information plaintiffs seek to obtain relates to allegations that MetLife and its lawyers knew that facts material to a policyholder's determination on how to vote on MetLife's demutualization were omitted from the Prospectus. Plaintiffs claim that MetLife's inside and outside counsel drafted the Prospectus and that "counsel are an obvious source of evidence on why MetLife omitted from the[ ] public disclosures information that its senior executives and board considered in approving demutualization." (Letter from Ptf. to Hon. K. Tomlinson, dated July 10, 2006.) MetLife opposes plaintiffs' request by generally asserting that the information sought is protected by the attorney-client privilege. A gamut of reasons is offered by MetLife, including that no fiduciary duty existed between MetLife and the class members at

and "Policyholder Information Booklet Part Two."

the time of the attorney-client communications being sought [4], and that the communications are not discoverable under the crime-fraud exception, as argued by the plaintiffs.

As we see it, the attorney-client privilege has no application in this context, where a mutual life insurance company attempts to shield from its policyholders communications with counsel hired to represent the company in a reorganization process that requires the policyholders' vote. Courts have consistently reaffirmed the basic principle that a mutual insurance company, as MetLife was here prior to its demutualization, exists solely to benefit its policyholders. *See Fidelity and Cas. Co. of New York v. Metropolitan Life Ins. Co.,* 42 Misc.2d 616, 623–24, 248 N.Y.S.2d 559 (N.Y.Sup.Ct.1963) (stating that "a mutual company is operated wholly for the benefit of its policyholders[.]," and that "[a] mutual insurance company is a cooperative enterprise in which the policyholders constitute the members for whose benefit the company is organized, maintained and operated"), citing *Penn. Mut. Life Ins. Co. v. Lederer,* 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698; 29 Am.Jur., Insurance, p. 504, § 89; Insurance Law, § 57. The Supreme Court has clearly stated many years ago that a mutual life insurance company "performs the service called insuring wholly for the benefit of their policy holders[.]." *Penn Mut. Life Ins. Co. v. Lederer,* 252 U.S. 523, 533, 40 S.Ct. 397, 64 L.Ed. 698 (1920); accord, *Equitable Life Assur. Soc. of the United States v. Bowers,* 87 F.2d 687, 689 (2d Cir.1937) (noting that "a company is mutual when there is no group but the policyholders who have interest in it, or power over it"), citing *Penn Mutual Com-*

*pany v. Lederer,* 252 U.S. 523, 535, 40 S.Ct. 397, 401, 64 L.Ed. 698. This long-standing concept has not been altered.

 A mutual insurance company's role with respect to its policyholders is to apportion the company's surplus—created in part from the payment of premiums paid by the policyholders—equitably among policyholders in proportion to their contributions thereto. *See Fidelity and Cas. Co. of New York,* 42 Misc.2d at 624, 248 N.Y.S.2d 559 (N.Y.Sup.Ct.1963), citing *Rhine v. New York Life Ins. Co.,* 273 N.Y. 1, 6 N.E.2d 74 (N.Y.1936); *Penn. Mut. Life Ins. Co. v. Lederer,* 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698 (1920). "[T]he distribution of available surplus to policyholders in a mutual company is mandatory[.]" *Fidelity and Cas. Co. of New York,* 42 Misc.2d at 624, 248 N.Y.S.2d 559. When a mutual insurance company demutualizes, its surplus belongs to those who were its members at that time. *See* N.Y. Ins. Law. § 7312(d)(3)(B) (McKinney's Consol. Laws, 2000) (stating that in a reorganization, "the consideration to be given in exchange for the policyholders' membership interest shall be equal to the statutory surplus of the mutual life insurer.") Therefore, upon MetLife's demutualization, its policyholders were and are entitled to the company's surplus.

Here, upon MetLife's demutualization, the participating policyholders' rights to participate annually in divisible surplus, and the right to share in the distribution of surplus and other net assets in a liquidation, were exchanged, except to the extent of policyholder dividends paid from designated assets in what MetLife called a

---

4. Under New York law, which governs the internal affairs of a New York corporation like MetLife, "an insurance company does not owe its policyholder a common-law fiduciary duty, except when it is called upon to defend its insured." *Fiala v. Metropolitan Life Ins. Co.,* 6 A.D.3d 320, 322, 776 N.Y.S.2d 29 (N.Y.App.Div.2004).

"closed block."[5] (Amended Compl. at ¶ 28). However, plaintiffs allege that Met-Life shifted $6 billion of accumulated premium payments by the policyholders (i.e. surplus monies) into the future profits of the new stock corporation established in the demutualization, and that such shift in fact reduced policyholder dividends by $9 billion because policyholders were unable to take advantage of $3 billion in tax benefits derived from the closed block.[6] (Ptf's Mem. at 5, ECF[7] # 225; Letter from Ptf. to Hon. K. Tomlinson, dated August 2, 2006). MetLife omitted information about this shift in the Prospectus and other disclosures made in connection with seeking the policyholders' vote on the demutualization.[8] (Ptf's Mem. at 5, ECF # 225).

Under the circumstances of this case, MetLife may not in good faith claim that the attorney-client privilege protects from disclosing to its policyholders communications (oral and written) between MetLife and its counsel regarding purported omissions or misrepresentations from offering materials sent to policyholders in connection with their decision on how to vote on MetLife's demutualization. At the time when the purported communications were made, i.e. prior to the demutualization, MetLife's policyholders were the clients for MetLife's in-house and outside counsel, because they were MetLife's beneficiaries and the beneficiaries of MetLife counsel's advice. As such, they are entitled to discovery concerning communications related to the drafting of the Prospectus and the facts omitted from the Prospectus. *See, e.g., Fidelity and Cas. Co. of New York*, 42 Misc.2d at 624, 248 N.Y.S.2d 559 (N.Y.Sup. Ct.1963) (observing that "a mutual company is operated wholly for the benefit of its policyholders[.]"); *cf. Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir.1970) (finding as another persuasive reason for disclosure, apart from any obligation running from corporation to shareholders, which may be akin to one arising out of a trustor/trustee relationship, that "[i]n many situations in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other"), citing *Pattie Lea, Inc. v. District Court*, 161 Colo. 493, 423 P.2d 27 (1967) (en banc) (holding that the accountant privilege did not apply to protect communications between certified public accountant and his corporate client from disclosure to stockholders because the employment of the certified public accountant by the corporation was for the benefit of all the stockholders.); *Silverman v. Liberty Mut. Ins. Co.*, 2001 WL 810157, at *6 (Mass.Super.2001) (noting, in a context similar to the case at hand, that a mutual insurance company has a duty to act in good faith towards its policyholders when the company makes disclosures to its policyholders asking them to surrender their equity rights).

---

**5.** In a reorganization, "[t]he mutual life insurer's participating business comprised of its participating policies and contracts in force on the effective date of the reorganization shall be operated by the reorganized insurer as a closed block of participating business, for policyholder dividend purposes only[.]" N.Y. Ins. Law. § 7312(d)(3)(A) (McKinney's Consol. Laws, 2000).

**6.** Plaintiffs contend that "MetLife's actuarial advisors calculated that each $1 billion added to the closed block increased dividends to policyholders by $1.5 billion due to 'the tax efficiency of policyholder dividend distributions.'" (Letter from Ptf. to Hon. K. Tomlinson, dated August 2, 2006).

**7.** The reference to ECF is to this Court's electronic filing system.

**8.** These allegations, if true, are a nice piece of misappropriation.

*Silverman* arose in a reorganization context, where Liberty Mutual Insurance Company sought to reorganize from a mutual insurance company to a stock insurance company. *Silverman* at *1. The plaintiffs in that case were policyholders who alleged that "Liberty, by printing and planning to distribute to all policyholders its Policyholder Information Statement Relating to Proposed Plan of Reorganization ... ("the Proxy Statement") and the accompanying 12–page Policyholder Guide, will through false statements and omissions of material facts be misleading Liberty policyholders into trading their equity rights in Liberty for equity rights in Liberty Mutual Holding that are worth far less." *Id.* at *2. Plaintiffs therefore moved for a preliminary injunction enjoining Liberty from distributing the Proxy Statement and Policyholder Guide to policyholders without making fair and adequate disclosures. Liberty moved to dismiss the complaint by arguing *inter alia* that it cannot be found in breach of any fiduciary duty because it has no such duty to its policyholders.

The Court's ruling in *Silverman* is instructive here.[9] The Court held that "[i]t may indeed be true that the relationship between a stock insurance company and its insured is purely contractual. It may also be true that, with respect to matters concerning the contractual rights of insureds in a mutual insurance company, the mutual insurance company has no fiduciary duty to its insured. However, this Court does not accept that, with respect to disclosures made to policyholders in a mutual insurance company asking them to surrender their equity rights, the mutual insurance company has no fiduciary duty to its policyholders.... Given the allegations of the complaint, it is sufficient here for that fiduciary duty to be simply a duty to act in good faith to ensure that policyholders, when asked to vote on a proposal that will extinguish their equity rights, are provided with accurate and adequate information on which to base their vote." *Id.* at *6.

Similar considerations and concerns are present here. MetLife's in-house and outside counsel drafted the Prospectus that allegedly failed to disclose or disclosed misleading information material to MetLife's policyholders' decision on how to vote on the demutualization.[10] As part of the demutualization process, MetLife's policyholders surrendered their equity rights in the mutual insurance company.

Based on the foregoing reasons, we find that plaintiffs here are entitled to discover, examine and consider communications between MetLife and its lawyers related to the alleged omissions and misstatements made in connection with MetLife's demu-

**9.** In its opinion, the Court cogently described the "theory of mutuality" inherent in a mutual insurance company: "The theory of mutuality is to align the interests of policyholders as owners with their interests as insurance customers by providing policyholders with an incentive to prevent injuries and minimize losses so as to keep premiums low and permit the insurance ·company's surplus to remain high enough to warrant policyholder dividends or refunds of premium. Consequently, while a person who purchases an insurance policy from a stock insurance company is buying only a contract right in that insurance policy, a person who purchases an insurance policy from a mutual insurance company is buying *both* a contract right in that policy and an equity right in the company (what another mutual insurance company used to refer to as 'a piece of the Rock')." *Id.* at *1.

**10.** This Court has previously found that the alleged misrepresentations and omissions from the Prospectus are material in the sense that a reasonable investor might have considered them important in making his or her decision. *See In re MetLife Demutualization Litig.,* 2007 WL 1395560, at *1 (E.D.N.Y. 2007).

tualization, which required the vote of MetLife's policyholders.

## CONCLUSION

In sum, plaintiffs may seek from Met-Life documents relevant to plaintiffs' allegation that MetLife misstated or omitted from the public disclosures information that its senior executives and board considered in approving the demutualization.