FLORENCE S. WELLS, Plaintiff, *v.* METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

City Court of New York, Kings County, February 9, 1939.

*Anschel E. Barshay* and *Philip Hoffman*, for the plaintiff.

*Tanner, Sillcocks & Friend*, for the defendant.

GOLDSTEIN, J.   The facts here are not in dispute.   On January 1, 1931, the defendant issued its insurance policy in the amount of $2,000 to Ernest J. Wells, in which policy the plaintiff, Florence S. Wells, his wife, was designated as beneficiary.   The premiums were paid regularly by the policyholder until July 1, 1936, when the policy was in default because of non-payment of premium. By the terms of the policy he was from that date on entitled to " extended term insurance," which was to be paid for by the cash value or net equity of the policy as of that date.   If that cash value or net equity was $24.73, it would have continued the policy up to the date of the death of the insured, December 16, 1937. If the net equity for cash value was only $19.12, the extended term insurance would not have continued the policy to that date. Consequently, the determination of the actual cash value or net equity in the policy is of controlling significance.

After 1931 the policyholder received so-called " dividends " on his policy as follows: For the year 1932 the sum of $9.88; for the years 1933 and 1934, $9.88 in each year.   For the year 1935, a dividend in the sum of $9.88 was set aside and allocated but never paid over to him.   The defendant concedes that, if this dividend had been credited to the insured's account, the equity with the defendant would have been more than sufficient to purchase extended term insurance down to the date of his death.   It is also admitted that all other policyholders whose policies were in force during the year 1935 received their proportionate share of the " dividend " for that year.   The deceased, however, was deprived of them by the defendant and the reasons offered for such action by the defendant are these:

Dividends for the year 1932 were not paid until January, 1934. Dividends for the year 1933 were not paid until January, 1935. Dividends for the year 1934 were not paid until January, 1936.   The dividend for 1935 was retained by the defendant because it claims that the dividend was not payable until the next anniversary of the policy following the next succeeding thirtieth day of April, and

since the policy lapsed in July, 1936, the alleged dividend for 1935 was not payable until January, 1937. By that time the deceased had already died. The argument is based upon paragraph " 12 " of the policy, which reads as follows: " This policy is a participating contract except when continued as non-participating paid-up Term Insurance, and the Company will annually, as of the thirty-first day of December of each year, ascertain and apportion any divisible surplus accruing hereon. Such Divisible surplus except as stated in the next succeeding paragraph, will be payable on the next anniversary of this policy following the next succeeding thirtieth day of April and May, at the option of the Insured, or of the Assignee of record, if any, be either (a) paid in cash; or, (b) applied within the grace period towards the payment of any premium or premiums; or (c) applied to the purchase of a participating paid up addition to the sum insured; or, (d) left to accumulate to the credit of this policy."

The defendant's argument then proceeds thus: If a dividend were ascertained and apportioned as of December 31, 1935, it would not be payable according to the terms of the policy before quoted until January 1, 1937, which is the anniversary date of the policy next succeeding April 30, 1936. As mentioned hereinabove, on January 1, 1937, the policy was operating upon a *non-participating extended term* basis and the insured was, therefore, not entitled to receive the dividend payable on that date. The policy provides specifically that participating in divisible surplus is available only to " participating " policies, that is to say, those policies under which premiums have been currently paid. The court observes, therefore, that strictly according to the terms of the policy this alleged dividend which the plaintiff now claims should be credited to the policy was not payable. If not, then the term of the extended insurance had expired prior to the death of the insured and at that time the policy was wholly out of benefit and had no value whatever.

The defendant then urges that this policy is governed by the provisions of section 83 of the Insurance Law, subdivision 2 thereof, which refers to term and industrial policies. Finally, says the defendant, a resolution of the board of directors made the payment of the 1935 dividend contingent upon payment of future premiums.

Before commencing this action, the widow's attorney wrote to the State Department of Insurance requiring its opinion. He was advised that although the Department agreed with his interpretation of the policy, the Department could only recommend favorable action on the part of the defendant. It could not *compel* favorable consideration of the claim. This was followed by a letter to the president of the defendant. That resulted, apparently in an offer to repay the $9.88, but not the amount of the policy.

None of the arguments advanced by the defendant appeals to the court, either in logic or in law. The second argument is disposed of by the defendant itself in its opposing affidavit where it distinctly and unequivocally declares that the policy in suit is an " Ordinary " policy and not a term or industrial policy. It is difficult to understand the defendant's attempt at confusing the policy in suit with " term " or " industrial " policies. Furthermore, this policy is plainly governed by subdivision 1 of section 83 of the Insurance Law, as well as by sections 88, 89 and 101, subdivision 5. These sections of the Insurance Law require that the proportion of surplus accruing upon such a policy " shall be ascertained and distributed *annually* and not otherwise." (§ 83.) Furthermore, " such apportionment in the case of any policy shall not after the first policy year be made contingent upon the payment of the whole or any part of the premium for the subsequent policy year." (Id.)

It is further provided in that same section that the share of the surplus so apportioned shall " be applicable to the payment of any premium or premiums upon said policy or to the purchase of a paid-up addition thereto." Section 101, subdivision 5, plainly requires that each ordinary life policy contain a provision " that the policy shall participate in the surplus of the company *annually*." Section 89 prohibits discrimination between individuals of the same class, in the amount or payment or return of premiums or rates charged for the policies of insurance or in the dividends or other benefits payable thereon. Section 88 clearly indicates that the defendant's interpretation concerning " participation " is inaccurate.

After the so-called equity of the policy is applied to purchase extended term insurance, *that extended term insurance* is without participation. But that does not mean that a policyholder is thereby deprived of a right to participate which had already accrued prior to the lapse of the policy. In other words, at the end of the year 1935, the plaintiff was entitled to participate in the surplus for the year 1935 to the same extent as any other policyholder in good standing at the end of that year. Of that dividend he could not be deprived by any subsequent act of the insurance company. A forfeiture of the policy in 1936 in no wise affected his right to that dividend for *1935*, and he was, therefore, entitled to be credited with the additional sum of $9.88 as a dividend for the year 1935 — a year in which his policy was in full force and effect and for which he had paid the agreed premium in full. The provision concerning " non-participation " begins to operate from the date of lapse of the policy and applies only to " dividends " declared thereafter. It does not destroy a right theretofore accrued. Since other policy-

holders who had paid the same premium and were in a similar position received their dividend for that year, the deceased policyholder, too, was entitled to it.

The resolution of the board of directors, urged as a defense, is equally insufficient. In the first place, the resolution by no means clearly applies to the policy in suit. It is to be doubted whether the board had before it for consideration the claim here sued upon. Since only a fragment of the resolution has been presented to this court, that doubt must be resolved against the defendant. Second, even if it were clearly applicable, it would be void to the extent that it purports to vary the terms of the policy itself, because the policy contains no such condition to the payment of dividends as is contained in the resolution. Nor may the board lawfully withhold such a " dividend " if the facts warrant its distribution. Furthermore, section 83 of the Insurance Law distinctly requires that the apportionment of dividends in the case of any policy shall not, after the first policy year, "be made contingent upon the payment of the whole or any part of the premium for the subsequent policy year." Therefore, even if there were such a provision in the policy itself, it would, in my opinion, be void, because it would contravene section 83 of the Insurance Law.

Finally, in so far as the resolution attempts to incorporate a condition or stipulation not contained in the contract of insurance itself, it violates section 58 of the Insurance Law which requires the entire contract between the parties to be incorporated in the policy and prohibits the incorporation therein, by reference, of any by-laws or other rules not physically made a part of the policy at the time when it is issued. (See *Atlantic Life Ins. Co.* v. *Pharr*, 59 F. [2d] 1024; certiorari denied, 287 U. S. 647.)

But all of the arguments of the defendant are fallacious for a more fundamental reason. They overlook the essential nature of the " dividends " to which every policyholder in a mutual company is entitled. The average policyholder purchasing a participating policy in a mutual company believes that his policy represents an investment and that he will share in the " profits " of the company. That, however, is not the fact. The so-called " dividends " are not dividends at all, in the accepted and ordinary sense of the word. In fact, they represent an excess premium or overcharge paid by the policyholder, and then returned to him, without interest, less the costs attendant upon collection and administration and various other deductions. In *Rhine* v. *New York Life Ins. Co.* (248 App. Div. 120; affd., 273 N. Y. 1), Mr. Justice DORE, writing for a unanimous Appellate Division said (at p. 125): " As the policyholders in a mutual life insurance company have paid in more than

was necessary, they are entitled to a return of such overpayments. *The dividends of a mutual life insurance company are, accordingly, strictly speaking, not profits as in the case of an ordinary corporation, but really constitute a return to the policyholder of the amount he has been overcharged for his insurance.* In life insurance companies operating on the mutual plan the whole of the divisible surplus is distributed among the members annually as equally as may be in the proportions in which they have contributed to it."

In other words, the policyholder creates his own surplus, by paying more for his insurance in advance than it should actually cost, based upon the mortality tables. At the end of the year, the exact amount of this excess is calculated by the company and returned *pro rata* to the policyholders. As Judge LEHMAN of the Court of Appeals said in the *Rhine* case (at p. 13): " The declaration of a dividend upon a policy reduces *pro tanto* the cost of insurance to the holder of the policy. That is its purpose and effect."

Viewed in this light, the defendant's contention appears to be most unreasonable. In effect, it is saying that unless the policyholder continued to make overpayments of premium for 1936 and 1937 as well, he was not entitled to a return of his overpayment of premium for 1935. Certainly, the policy does not so provide and the statute specifically prohibits that interpretation. It is plainly inequitable and unconscionable.

Furthermore, the defendant had this overpayment in its possession at the end of the year 1935 and at least down to the date of the lapse of the policy. The $9.88 in question was just as much in the possession of the defendant on the date of lapse as it is today. Thus, even if it were not actually " payable " to the insured at the end of the year 1935, it still would constitute — as between the defendant and the policyholder — an element of equity to which the policyholder might justly lay claim in the event of lapse. Put differently, the policyholder had the power to *prepay* the defendant to the extent of the $9.88 already in its possession. The defendant cannot complain if it received and retained it as its own property. A similar result was reached in *Finley* v. *Massachusetts Mut. Life Ins. Co.* (172 La. 477; 134 So. 399).

This case may, therefore, be summed up thus: The widow of the policyholder is being opposed by resourceful and technical contentions to deprive her of the amount due on the policy. The dispute concerns an overpayment of $9.88 admittedly received by the defendant as premium and retained by it for several years without conferring any benefit. The insistence by the insurance company in this case upon a strict and legalistic interpretation of the policy in suit sharply calls attention to the fact that this action

is one of a large class which often comes before the courts for adjudication. A study of the principle and character of these actions which are becoming more frequent and more engrossing for the litigants and the courts, prompts the comment upon the inadequacy of the present legislation and of the means of preventing, as well as of adjusting, the disputes which have become so common in the field of insurance, at least as applied to human life. The state of the law in this field does not appear to the observation and experience of this court to have kept abreast of developments of social, economic and governmental significance which vitally affect life insurance in particular and other forms of insurance in general.

High pressure salesmanship, misleading provisions in insurance policies, unusually high lapse ratio (over sixty-six and two-thirds per cent), unfair advantages taken of inexperienced and poverty-stricken policyholders — these were but a few of the evils condemned by the Legislature when it enacted the Savings Bank Insurance Bill last year. (Insurance Law, §§ 307–339; Laws of 1938, chap. 471.) But that represents only a partial measure of remedial force in a very comprehensive and far-reaching field of public interest and welfare. When the average citizen is asked to take out a policy, he is presented with a glowing picture of the benefits which he and his family will enjoy once the policy is in force. Although the policy contains numerous phrases and provisions as to the interpretation of which even our courts do not always agree, much less attorneys, the prospect is told nothing about them. It is a rare case when the policyholder sees the policy before he applies for it. Even rarer is his study of its technical language *after* he receives it and pays the first premium. Indeed, there appears to be a legislative presumption that the policyholder is ignorant of the terms of his policy. (See Insurance Law, § 60, subd. [C].) It is only when the policyholder is in dire need or suffers some ill fortune that he consults the policy at all. Then, for the first time, does he find, all too frequently, that the glowing picture presented to him when he purchased the policy is non-existent, or at least substantially marred. He discovers a mass of technical phrases, utterly meaningless to the average layman, and of doubtful import to trained minds. If misfortune should strike him, it will be the burden of his widow to read and attempt to understand the fine print and hairline-construed phrases of the policy.

Furthermore, as a result of court decisions interpreting various policies, the companies promptly make changes in the wording of their policies in order to comply with, or more often overcome, decisions favorable to the policyholders. When that policy in turn is sold to the public, nothing is told to it about either the most

recent court construction or the changes made in the policy by the company. Nothing is told to the policyholder in plain language which would eliminate all question of policy construction at a later time. The result is that many years after the policy is written it is often learned that the policy bars relief because of some minor technicality.

During this entire time, the policyholder has been believing that he has been saving his money and protecting his family as well. Yet he finds to his surprise that if he desires to borrow on his own savings he must pay a substantial rate of interest for borrowing his own money. If he desires to withdraw his savings he cannot do so without canceling the entire policy. Usually he is faced with this dilemma when he can no longer obtain other insurance. That accounts for the fact that most policies do not remain in force until their natural maturity. They are either canceled or lapsed. Cancellations and lapses far outnumber the former. In addition the policyholder is led to believe that the " dividends " which the company sends him annually are actually " dividends " in the same class with the dividends which he would receive upon a share of stock in a corporation. That, as has been shown above, is a deceptive illusion.

The most poignant disappointment, however, is generally not that of the insured but that of his widow or other beneficiary, as in the case at bar. Had the insured known, when he took out his policy, that he was purchasing a lawsuit over the sum of $9.88, the sole purpose of which is to construe the policy, he in all probability would not have purchased it. He would have realized immediately that his widow would not be possessed of sufficient funds to employ counsel as skilled and learned in the technicalities of life insurance law as are counsel for the insurance company, and that the cost of litigation in this court and through various appellate courts would be prohibitive. Fortunately her counsel have presented her arguments most ably. Furthermore the mere assertion of these technicalities breeds a distrust that ought not to exist between the assured and the insurance companies. The fact that policyholders' protective associations have been organized and are thriving in increasing numbers is proof of the fact that an unhealthy condition exists.

Insurance companies perform some most valuable functions in our present day society. They should do more. If the directors of these insurance companies placed the interests of the public before the selfish interests of the company and its self-perpetuating executives, a more humane policy toward these claims would inevitably result. It is difficult to believe that in spite of repeated

investigations of insurance companies and their methods, nothing has been done to jostle their management into a keener realization of responsibility and duty to the public, rather than to their own selfish ends. Insurance companies, through control of billions of dollars of public moneys, wield a vast power, too great for the kind of management exemplified by the attitude of the company in this and similar cases. The officials of these companies represent, in truth, an unofficial government that requires the stringent regulation so long sought, but not yet achieved. Many years ago Justices HUGHES and BRANDEIS pointed out some of the evils here noted. Unfortunately too few of them have been corrected. Others have been added since.

The principle of insurance is being extended to hitherto undreamed-of areas of economic and social endeavor. Its scope and effectiveness is being broadened daily. But in our dynamic society, insurance policies, as well as insurance companies, must likewise keep pace with the times. The State has now acknowledged in a multitude of ways its obligation to protect the public in any private enterprise, whenever that enterprise becomes affected with a *public interest*. (*German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389.) To my mind, life insurance has reached that stage of economic and social development which requires broader governmental supervision than has heretofore been accorded it, implemented with administrative quasi-judicial machinery to deal promptly and effectively with various phases of insurance as they affect the policyholders.

That insurance is affected with a public interest, and is subject to plenary regulation and control for the public good was definitely and broadly established by the United States Supreme Court twenty-five years ago in the case of *German Alliance Insurance Company* v. *Kansas* (*supra*), and yet the exercise of the legislative powers then fully recognized has lagged far behind the development of the law in cognate or analogous fields of public interest. The reasoning of the majority opinion in that case by Mr. Justice McKENNA upholding the sovereign power of regulation and the facts adduced to support the existence of such power, would seem to have pointed most strongly to the necessity of arousing a keener legislative interest in the problems of insurance and in the machinery requisite to safeguard the public as well as private interests than is evinced by the legislation enacted since 1914, at least in the State of New York, which has an unexcelled record for legislation of vast social benefit.

No one should be permitted to sell a lawsuit under the guise of an insurance policy. In spite of all theorizing, the fact is that the

policyholder and the insurance company are *not* upon an equal footing. Indeed, the analogy to labor-employer contracts is not too remote, for today insurance is a necessity and not a luxury.

The law, however, lags behind the public interest. In sharp contrast with the development of regulatory laws and machinery for their administration and enforcement in other businesses affected with a vital public interest, the general legislative policy has been one of *laissez faire* — a policy long abandoned in analogous fields of economic and social welfare. The solution to this pressing problem appears to lie with the Legislature and the Governor. Perhaps a fact-finding commission consisting of representatives of the insurance companies, the general public, the bar and policyholders' associations, or similar groups, ought to be created to explore the complex problems in their various relations with the view of making recommendations to the Legislature. For example, policies ought to be standardized and considerably shortened. The suggestion made by Superintendent Pink in his recommendations to the Joint Legislative Committee of the recodification of the Insurance Law and dated October 24, 1938, to the effect that " authority should be given the Superintendent to disapprove misleading provisions in insurance policies," should be adopted.

The policy should consist of a plain and concise statement of the facts, not in technical language requiring judicial construction, but in simple words of unmistakable import that cannot be changed to favor the company by by-law, contract or otherwise, except upon direct authorization of the Superintendent of Insurance or the *Legislature.*

The improvements so far achieved in the form of tariff schedules and service contracts of carriers and other public utilities by regulation of the State of New York, should furnish an example for emulation and greater achievement by insurance companies. Indeed, the statute itself ought to contain the standard clauses to be inserted in every insurance policy, in equally clear language. " Fine type," verbose sentences with numerous clauses and pyramided conditions and provisos ought to be banned or at least minimized. An explanation and translation of the policy ought to be furnished to every person incapable of fully understanding the English language who requests it. The term " dividend " should be abolished and the phrase " return of excess premium " substituted therefor unless true dividends are actually declared. Before any policy is written a copy of the policy ought to be furnished to the prospective policyholder along with a booklet further explaining its implications in the light of possible circumstances. *Particularly* should this be true of " mutual " companies, for in that case the officials and directors of the company are trustees for the policy-

holders and owe them the same fealty that is owed from any trustee to his beneficiary. The board of directors of such a company should not be a mere aggregation of representative names. They should actively represent the best interests of the policyholders and not act simply as a perfunctory body, blindly perpetuating practices long condemned.

The policyholder should be told the difference between renewable term insurance and so-called "straight life insurance," which is really insurance *or* savings, although both are paid for simultaneously. The policyholder should be told the facts at least as clearly as they are contained in the booklets distributed by the State Department of Insurance, Savings Bank Life Insurance Division.

I venture to say that much litigation could in that way be avoided, grief to insureds and dependents spared, and good will between policyholders and insurance companies promoted. In the words of Superintendent of Insurance Louis H. Pink, contained in his report of October 24, 1938, above referred to (p. 35):

" It will take considerable courage and effort to alter the situation but this is exactly what the companies are called upon to do. They must exercise their best leadership in an effort to put the sale of industrial insurance on a higher plane. Quality, service to the public, and not mere production must be the goal." Though this quotation refers to industrial life insurance, it is equally applicable to ordinary life insurance. It is to be hoped that the protection here urged will not be long in coming.

The motion for summary judgment should be granted in all respects.