# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 27, 2009

Charles R. Fulbruge III
Clerk

No. 08-10450

KIMBERLY-CLARK CORPORATION

Plaintiff - Appellee

v.

FACTORY MUTUAL INSURANCE COMPANY

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before GARWOOD, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

This case concerns defendant-appellant Factory Mutual's decision in October 2003 to distribute to its policyholders a $325 million membership credit that was contingent on policy renewal. Factory Mutual is a mutual insurance company[1] and plaintiff-appellee Kimberly-Clark was a policyholder for almost

---

[1] "Mutual insurance, as its name implies, exists where several persons have joined together for their united protection, each member contributing to a fund for the payment of the losses and expenses. Under such an organization, each member is in a sense both an insured and an insurer . . . The policyholders in a mutual are equivalent to stockholders in a stock corporation in so far as rights and remedies are concerned. Like stockholders, policyholders participate in the operation of the mutual through voting rights, and share in the company's financial success or failure." LEE RUSS & THOMAS SEGALLA, 3 COUCH ON INS. § 39:15 (3d ed. 2008) (footnotes omitted); *see also Heritage Healthcare Servs., Inc. v. Beacon Mut. Ins. Co.,* No. C.A. 02-7016, 2004 WL 253547, at *4 (R.I. Super. Ct. Jan. 21, 2004)

1

30 years with Factory Mutual and its predecessor company. The district court concluded that Factory Mutual breached its contract with Kimberly-Clark when it denied Kimberly-Clark its equitable share of the $325 million distribution. The district court held that because Kimberly-Clark was a policyholder and member in good-standing on the distribution's record date, Kimberly-Clark should be accorded its equitable share. We agree and AFFIRM the district court's judgment.

## BACKGROUND

Factory Mutual's charter stipulates that the company, like all mutual insurance companies, will "establish and maintain a surplus against extraordinary losses and other contingencies, by appropriating from time to time such sums as the board of directors may determine" "in addition to any unearned premium or reinsurance." In accordance with the charter, Factory Mutual maintains a surplus fund that includes appropriated sums and unearned premiums to cover extraordinary losses and other contingencies. In mid-2003, Factory Mutual initiated internal discussions regarding a membership credit for its policyholders. One major reason for a membership credit was the unexpected growth in the surplus funds.

At about the same time, after extensive discussions with Factory Mutual, Kimberly-Clark indicated to Factory Mutual during a meeting with Factory Mutual on August 26, 2003, that it intended not to renew its policy. Kimberly-Clark's policy expired on October 1, 2003.

On October 8, 2003, Factory Mutual informed the Rhode Island Department of Business Regulation ("DBR") that it was planning a proposed membership credit. On October 9, 2003, Factory Mutual's Board of Directors

(unpublished) (same).

2

approved the proposed $325 million membership credit. Factory Mutual publicly announced the credit on October 20, 2003. In a series of documents, Factory Mutual described the membership credit to its policyholders. Factory Mutual set eligibility for the distribution as follows: "[a]ll Factory Mutual Insurance Company policyholders . . . *on the date of record* will be eligible to receive the membership credit when their policies renew during the membership credit period." (emphasis added). Factory Mutual thereby conditioned the distribution of the membership credit on a policyholder's future act -- signing a policy renewal before the policy expired. Factory Mutual also established the "date of record" (or record date) as September 30, 2003.

In its notices to policyholders, Factory Mutual specifically linked the membership credit to its surplus growth and framed the distribution as a reward or return from that growth. In an October 20, 2003 press release, Factory Mutual stated:

> Policyholders of commercial and industrial property insurer FM Global will receive a collective US$325 million in savings on their premium beginning January 1, 2004 *as a result of lower than expected property losses during recent years, resulting in higher than projected surplus growth.* The return will be disbursed to FM Global policyholders as a membership credit on premium for 2004 policy renewals.

(emphasis added). Factory Mutual specifically apportioned shares of the membership credit distribution based on the amount of each policyholder's premium contribution on the record date and the number of years the policyholder held a policy with the company. The distribution acted akin to a mutual insurance company's typical distribution of surplus capital as a return to policyholders in proportion to their past contributions, except that Factory

3

Mutual's distribution was contingent on policy renewal.[2]

On the distribution's record date, Kimberly-Clark was a Factory Mutual policyholder in good standing, but it had decided not to renew its policy when the policy expired on October 1, 2003. Because it was a policyholder in good standing on the distribution's record date, Kimberly-Clark requested a portion of the 2004 membership credit in cash, which Factory Mutual denied. Subsequent negotiations between the parties failed to resolve the dispute. Kimberly-Clark therefore filed suit on September 30, 2005, in the 116th Judicial District Court of Dallas County, Texas, against Factory Mutual, alleging breach of contract, fraud, negligent misrepresentation, unjust enrichment, and violations of the Texas Insurance Code. On October 24, 2005, Factory Mutual filed a notice of removal to the United States District Court for the Northern District of Texas. On October 5, 2006, the parties entered into a joint stipulation, dismissing with prejudice the fraud and negligent misrepresentation claims along with several Texas Insurance Code claims. On December 15, 2006, both parties filed cross-motions for summary judgment on the breach of contract, unjust enrichment, and remaining Texas Insurance Code claims.

On September 21, 2007, the district court issued a Memorandum Order granting summary judgment in favor of Kimberly-Clark on the breach of contract claim awarding Kimberly-Clark $3,062,776.90 in damages. The damages reflect the share of the distribution that Kimberly-Clark would have received had it been accorded a share. The district court found that the charter

---

[2] *See, e.g.*, *In re MetLife Demutualization Litig.* 495 F. Supp. 2d 310, 313 (E.D.N.Y. 2007) ("A mutual insurance company's role with respect to its policyholders is to apportion the company's surplus -- created in part from the payment of premiums paid by the policyholders -- equitably among policyholders in proportion to their contributions thereto."); Russ & Segalla, 3 Couch on Ins. § 39:18 ("As a general rule, the 'surplus' of a mutual company belongs equitably to the policyholders who contributed to it, in the proportion in which they contributed.").

of the company, the by-laws, and the policy unambiguously confirmed that Kimberly Clark "bargained for coverage by and membership in a mutual insurance company (as opposed to a stock insurance company) and all of the rights and benefits that typically accompany membership in a mutual insurance company." The district court therefore concluded that:

> Thus, the Court infers that under the Policy, upon purchasing a policy and obtaining membership in the Company, a policyholder gains an interest in the surplus and has a right to its equitable share in any distribution of such surplus as declared by the Board, so long as the policyholder is a member of the company on the relevant date. Consequently, refusing to provide Kimberly-Clark its equitable share of the surplus, even though the company was a member of Factory Mutual on the record date, breaches the Policy.

Factory Mutual timely appeals on two grounds: (1) that the district court erroneously considered the plaintiff's claims within a breach-of-contract framework rather than under a corporate governance framework; and (2) if the claims are considered within a breach-of-contract framework, the district court erred in concluding that Factory Mutual breached its contract.

## STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court: A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, the court must therefore "refrain from making credibility determinations or weighing the evidence." *Turner v.*

*Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

<u>ANALYSIS</u>

**I. Kimberly-Clark's claims are properly analyzed under contract law**

Factory Mutual contends that Kimberly-Clark's claims for a portion of the surplus distribution implicate corporate governance law, specifically the "business judgment rule,"[3] and therefore should not be considered under a breach-of-contract framework. This choice between viewing a mutual insurance policyholder's claims as a matter of contract or as a matter of internal corporate governance originates with the policyholder's dual roles vis-a-vis the mutual insurance company: the policyholder is both an insured customer and also a controlling member of the insurer-company. *See, e.g.*, *Keystone Auto. Club Cas. Co. v. Comm'r,* 122 F.2d 886, 889-90 (3d Cir. 1941); *Ohio Farmers Indem. Co. v. Comm'r,* 108 F.2d 665, 667 (6th Cir. 1940); *Hutchins Mut. Ins. Co. of D.C. v. Hazen,* 105 F.2d 53, 57 (D.C. Cir. 1939). Kimberly-Clark's claims against Factory Mutual can be framed as either a breach of Kimberly-Clark and Factory Mutual's contractual relationship or as Kimberly-Clark's disagreement with other co-members about corporate governance and internal affairs.

Kimberly-Clark's underlying claims allege that Factory Mutual improperly denied Kimberly-Clark's right, or eligibility, to a share of an announced surplus disbursement. Courts clearly consider a policyholder's *right* to a share of a surplus distribution as a matter governed by contract law whereas a policyholder's grievances with a surplus distribution's "timing, amount, and

---

[3] "The precise content of the Business Judgment Rule is provided by state law but, generally speaking, '[u]nder this familiar rule of American jurisprudence, the courts refrain from second guessing business decisions made by corporate directors in the absence of a showing of fraud, unfairness or overreaching.'" *Hoffman v. Kramer,* 362 F.3d 308, 317 n.4 (5th Cir. 2004) (quoting *Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 207 (5th Cir. 1992)) (alteration in original).

method"[4] are corporate governance matters and thereby insulated from most policyholder lawsuits by the business judgment rule. *See Equitable Life Assurance Society of the U.S. v. Brown,* 213 U.S. 25, 47 (1909); *Brown v. Royal Highlanders,* 299 N.W. 467, 471 (Neb. 1941); *see also Prudential Ins. Co. of Am. v. Miller Brewing Co.,* 789 F.2d 1269, 1279 (7th Cir. 1986); *Andrews v. Equitable Life Assurance Soc. of U.S.,* 124 F.2d 788, 789 (7th Cir. 1941); *Boynton v. State Farm Mut. Auto. Ins. Co.,* 429 S.E.2d 304, 307 (Ga. Ct. App. 1993); *Greeff v. Equitable Life Assurance Soc. of U.S.,* 54 N.E. 712, 715 (N.Y. 1899).[5]

The parties do not dispute the propriety of the timing or amount of the distribution, but Factory Mutual contends that its corporate decisions in respect to a policyholder's eligibility for a surplus distribution should be considered as part of its discretion over the "method" of a surplus distribution. At issue in this case is whether Factory Mutual's "method" of distribution discriminates against a particular subset of policyholders because they chose not to renew their polices but were otherwise in good standing and had contributed to the surplus. Such discrimination would be clearly outside of the board's discretion over surplus distributions because it would contravene state policy and is thereby not protected by the business judgment rule. *See N.Y. Life Ins. Co. v. Street,* 265

---

[4] In its admissions below, Factory Mutual describes the corporate board as having "discretion to determine the time, amount and method of distribution of the membership credit."

[5] In *Lopez v. State Farm Mutual Automobile Insurance Co.,* 2008 WL 2744609, at *4 (Tex. App.-Corpus Christi June 30, 2008) (unpublished), a Texas Court of Appeals in an unpublished decision contrasted the policyholder's contractual right to participate in announced dividends and the corporate board's discretion over the distribution of those dividends: (1) "Mutual insurance policyholders do not purchase the right to receive dividends, only the right to participate in dividends, if any, on terms and conditions fixed by the board" and (2) "The relationship between a mutual insurance company and its policyholders is contractual, not fiduciary, and the insurer owes no duties to the policyholders other than those stated in the policy."

7

S.W. 397, 402-03 (Tex. Civ. App. 1924); TEX. INS. CODE § 544.052; RHODE ISLAND GEN. LAWS § 27-8-4 (describing state policy against discrimination among insureds of the same class). The question presented to us is therefore: whether Factory Mutual's discrimination breaches Kimberly-Clark's right to a distribution share if other policy-holders, with materially identical contracts and materially identical rights to a share, had received their shares. Accordingly, Kimberly-Clark's claims for a distribution share must be analyzed under a breach-of-contract rubric and not under the business judgment rule.[6]

## II. Factory Mutual breached its contract with Kimberly-Clark when it denied Kimberly-Clark its share of the surplus distribution

The policy contract is clearly labeled a "mutual insurance" contract. The policy is silent as to the board's discretion over the distribution of excess surplus, but states that "[t]his policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance." It also states that "[t]he insured by accepting this policy hereby becomes a member of this Company and subject to the provisions of its charter and by-laws, with power to vote at its meetings." Section 5 of Factory

---

[6] In its briefs, Factory Mutual emphasizes the fact that this case must be decided under Rhode Island and not Texas law. However, Factory Mutual also concedes in its briefs and in oral argument that Texas and Rhode Island's formulations of the business judgment rule do not conflict. *Compare Cates v. Sparkman,* 11 S.W. 846, 849 (Tex. 1889) *with Lynch v. John W. Kennedy Co.,* No. PB 03-3355, 2005 WL 1530469, at *6 (R.I. Super. Ct. June 23, 2005) (unpublished) (announcing similar formulations of the business judgment rule). Factory Mutual is correct that corporate governance issues must be adjudicated using the law of the state of incorporation, in this case, Rhode Island. *See Askanase v. Fatjo,* 130 F.3d 657, 670 (5th Cir. 1997). However, because the business judgment rules for Rhode Island and Texas do not conflict, this court need not undertake a choice-of-law analysis. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) ("Where there are no differences between the relevant substantive laws of the respective states, there is no conflict, and a court need not undertake a choice of law analysis."). The parties also do not dispute that the pertinent rules under Texas and Rhode Island contract law applicable to this case are not in conflict. Accordingly, we also need not engage in a choice-of-law analysis for the contract claims.

8

Mutual's Charter states:

> [E]ach natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy, but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy; provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for *all purposes*. The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

(emphasis added). Finally, section 10 of Factory Mutual's charter states: "Upon termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease." In sum, Factory Mutual and Kimberly-Clark's contract (1) is a "mutual insurance" policy; (2) acknowledges the "special regulations" applicable to mutual insurance companies; and (3) grants policyholders an entitlement as a member for "all purposes," which includes (4) rights and interests in the surplus until the policy's termination (unless the policy states otherwise, which is not the case here).

Courts consistently describe "mutual insurance" contracts as creating certain settled expectations between the parties. As the Wisconsin Supreme Court noted:

> Every policy-holder [of a mutual insurance company] knows, or ought to know, that he will remain a member so long as he remains a policy-holder and no longer. He knows, or ought to know, that as soon as his membership relation is established he becomes possessed of an equitable interest in the assets of the company consisting of all accumulations prior to his time, and such as may be added thereto during his membership, but which cannot be realized on in possession in the absence of a necessary distribution of the surplus on account of the company going out of business, or in some proper way.

9

*Huber v. Martin,* 105 N.W. 1031, 1039 (Wis. 1906); *see also Fid. & Cas. Co. of N.Y. v. Metro. Life Ins. Co.*, 248 N.Y.S.2d 559, 565 (N.Y. Sup. Ct. 1963). The Supreme Court in *Pennsylvania Mutual Life Insurance Co. v. Lederer* described the mutual company in this way:

> In a mutual company, whatever the field of its operation, the premium exacted is necessarily greater than the expected cost of the insurance, as the redundancy in the premium furnishes the guaranty fund out of which extraordinary losses may be met, while in a stock company they may be met from the capital stock subscribed. It is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder.

252 U.S. 523, 525 (1920); *see also Nat'l Chiropractic Ins. Co. v. United States,* 494 F.2d 332, 334 (8th Cir. 1974); *Thompson v. White River Burial Ass'n,* 178 F.2d 954, 957 (8th Cir. 1950); *Keystone Mut. Cas. Co. v. Driscoll*, 137 F.2d 907, 911 (3d Cir. 1943). Basically, the settled expectations when entering a contract with a mutual insurance company are: (1) the policyholders pay premiums into a common fund to cover contingencies, and (2) if there is an accumulated excess of capital beyond what is necessary to cover contingencies (i.e., excess surplus), the insurance company returns the excess in surplus distributions to the policyholders. This essential aspect of the mutual insurance company's relationship with its policyholders is so-called insurance at actual cost or "insurance at cost." *See White River Burial Ass'n,* 178 F.2d at 957 ("To say that an essential of mutual insurance is that the excess of premiums received over the actual cost of insurance shall be returned to the policyholders is but another way of saying that the essential of mutuality is insurance at cost."). We have stated that "[t]he furnishing of insurance to members at cost is the chief aim and function of a mutual insurance company, and any company which does not return to the policyholders or members the excess of the premium over the cost

10

cannot be said to be a mutual insurance company." *Am. Ins. Co. of Tex. v. Thomas,* 146 F.2d 434, 436 (5th Cir. 1945). Texas courts also agree with describing the mutual insurance company's purpose as providing policyholders insurance "at cost." *See Mercury Life & Health Co. v. Hughes,* 271 S.W.2d 842, 845 (Tex. Civ. App. 1954) ("While the [mutual insurance] policyholders do not receive dividends, they get other equally valuable benefits. It is the duty of the directors to operate the company as economically as possible and furnish insurance to its policyholders as near actual cost as possible."). Other authorities unanimously agree in describing the purpose of a mutual insurance company as providing insurance "at cost." *See, e.g.*, *Mut. Fire Ins. Co. of Germantown v. United States,* 142 F.2d 344, 347 (3d Cir. 1944); *Fid. & Cas. Co. of N.Y.*, 248 N.Y.S.2d at 566 ("The distribution of divisible surplus is in reality an adjustment of the premium in retrospect of the amount found to have been actually necessary to cover the contingencies which materialized and it effects a reduction in the cost of the insurance."); *Dryden v. Sun Life Assurance Co. of Can.*, 737 F. Supp. 1058, 1062-63 (S.D. Ind. 1989); *C.J. Simons & Co. v. Am. Mut. Liab. Ins. Co.,* 257 A.2d 743, 745 (N.J. Sup. Ct. 1969); *McQuade v. Thacher,* 198 N.Y.S.2d 715, 718 (N.Y. Sup. Ct. 1960). *See generally* RUSS & SEGALLA, 1 COUCH ON INS. § 1:32 ("The object [of mutual insurance] is to provide insurance protection at cost.").

Consequently, because they contracted for "at cost" insurance, policyholders who contribute to a surplus are equitably "entitled" to a share of any announced surplus distribution as a proportionate return on their prior contributions to the accumulated capital stock. *See, e.g.*, *In re MetLife Demutualization Litig.* 495 F. Supp.2d 310, 313 (E.D.N.Y. 2007); RUSS & SEGALLA, 3 COUCH ON INS. § 39:18 ("As a general rule, the 'surplus' of a mutual company belongs equitably to the policyholders who contributed to it, in the

11

proportion in which they contributed."). Consistent with these authorities, we have stated, in a diversity case involving Texas law, that:

> Dividends normally belong to the stockholders, which in a mutual company are the policyholders, but the insured though not a stockholder may by contract be allowed to participate. This share in profits more naturally belongs to the insured than to the beneficiary, and is a return to him of a part of his premium which the year's results have shown was not necessary to have been paid to maintain the insurance with its legal reserve.

*Union Cent. Life Ins. Co. v. Williams,* 65 F.2d 240, 243 (5th Cir. 1933). Similarly, Rhode Island has defined "mutual insurance company" to "mean[] a corporation in which shares are held exclusively by members to whom profits are distributed as dividends and members are both the insurer and the insured" in a health insurance act. R. I. GEN. LAWS § 27-66-4(9) (emphasis added). Here, Factory Mutual's surplus distribution was apportioned based on past contributions, and therefore policyholders who contributed, like Kimberly-Clark, should be entitled to a share.

Because the right to the surplus is dictated by contract and is the policyholder's equitable right based on past contributions, the corporate board has no competing right to the surplus assets once they announce the surplus to policyholders. The Kentucky Supreme Court has stated:

> [W]here the company is a mutual, being conducted on the plan of giving the cheapest safe insurance to its members, all surplus ought to belong to the members, the policy holders. For in a purely mutual company there are no stockholders, and no one else therefore to whom the surplus could go than its policy holders. And it should in equity go to those who had contributed it. The officers of such a corporation being paid salaries for their services have no interest as such in the surplus.

*U.S. Life Ins. Co. v. Spinks,* 96 S.W. 889, 894 (Ky. 1906) (emphasis added); *see*

12

*also Carlton v. S. Mut. Ins. Co.,* 72 Ga. 371, 1884 WL 2172, at \*21 (Ga. June 10, 1884); RUSS & SEGALLA, 3 COUCH ON INS. § 39:37. Like a trustee, the board manages and holds the funds until the funds are distributed to the insured-beneficiary, at which point it no longer has a competing interest over the funds. Summarizing these principles, Russ & Segalla, 3 Couch on Insurance § 39:40, concludes:

> Although the legal title to the property of a mutual company is held by the company, the property is held for the benefit of its members, policyholders, and stockholders. The funds of the company are to be treated as a trust fund for the members. . . .
> Each member has the same proportionate interest that every other member possesses. Policyholders are entitled to participate in the annual surplus of the company and if there is an inequitable distribution of surplus a policyholder may sue to obtain his or her proportionate share. The right to share in a surplus may, however, be restricted to current policyholders.

(footnotes omitted); *see also Huber,* 105 N.W. at 1032. Accordingly, a corporate board has the discretion to manage the "timing, amount, and method" of a surplus distribution but once a distribution's timing, amount and method is declared, the distribution funds no longer constitute the company's property; instead, the funds become the joint asset held by the members who are policyholders at the distribution's operative date. The Wisconsin Supreme Court stated:

> All this results in a necessity that *some definite time be adopted when the rights of individuals become fixed*, after which may be applied the arithmetical process by which they become known. In deference to such necessity, the rule has become settled as to stock corporations that a dividend belongs to those who own the stock when it is declared. Complete analogy exists between rights of members in a mutual insurance company and stockholders in a stock company in and to such a surplus. Declaring a dividend is nothing but authoritatively deciding to distribute some or all of the

13

surplus. We therefore think it entirely logical to apply the foregoing well-established rule, and to hold that on March 19, 1906,[the dividend distribution] became separated from the corporate assets and became the property of the several members then existing, payable to each on demand when the amount to which he was entitled had been ascertained.

*Zinn v. Germantown Farmers' Mut. Ins. Co.*,111 N.W. 1107, 1108 (Wis. 1907) (emphasis added) (citations omitted). As the Wisconsin Supreme Court acknowledged, there is a "complete analogy" between the "rights of members in a mutual insurance company and stockholders in a stock company in and to such a surplus." *Id*. As this court has stated in the analogous context of stockholder dividends:

> Under the law of Texas, a declaration of dividends creates a debt owed by the corporation in favor of each stockholder which cannot be rescinded. Although the declaration of this dividend provided that the sums thereunder were payable to the stockholders of record at such times and in such installments during the year as the directors saw fit, the liability of the company accrued as of the date of the declaration.

*C.I.R. v. Cohen,* 121 F.2d 348, 349 (5th Cir. 1941) (footnote omitted). In short, when a distribution is declared, the company becomes liable to pay the policyholders because they collectively own any announced distribution from the surplus. Because the corporate board controls the timing of the distribution, it necessarily establishes "some definite time . . . when the rights of [policyholders] become fixed" and the distributed funds are owned by those policyholders who have rights at that time. *Zinn*,111 N.W. at 1108.

The parties dispute the date when rights of the policyholders became fixed for the distribution, i.e., the distribution's operative date. Factory Mutual contends the operative date that fixes the rights of the policyholders is the date the corporate board declared its approval of the distribution (i.e., the

14

"declaration date"), which was October 9. Kimberly-Clark contends the operative date was the date of record or the record-date as described in the public notices to members describing the distribution details, which is September 30.[7] Factory Mutual's contention is without merit. Again, the "complete analogy" between stockholders in stock companies and mutual insurance policyholders, as to the distribution of a surplus, is useful. The distribution materials specifically establish the record date as September 30, 2003, and on that date Kimberly-Clark was a policyholder in good standing. The "declaration date" is important only because the company incurs liability to pay its promised distribution on the declaration date. However, we have defined the "record date" as the operative date one uses to determine the set of stockholders who can participate in a stock corporation's dividend distribution, i.e., the stockholders "of record." *See, e.g.*, *Caruth Corp. v. United States,* 865 F.2d 644, 648 (5th Cir. 1989) ("In general, dividend income is taxed to the shareholder who, on the record date, owns the stock with respect to which dividends are paid and who is entitled to receive the

---

[7] The corporate board of a mutual insurance company does not necessarily have to restrict a distribution to "current policyholders" at the time of the decision or announcement; it may choose to set a retroactive operative date. *See* RUSS & SEGALLA, 3 COUCH ON INSURANCE § 39:40 ("The right to share in a surplus *may*, however, be restricted to current policyholders." (emphasis added)). The dissent relies on a provision of the Charter that simply provides that a policy is effective only during the effective life of the policy. The corporate board decided to set the operative date, *i.e.*, the "record date," for its distribution on a date within the effective life of Kimberly-Clark's policy. The board also stated that "[a]*ll Factory Mutual Insurance Company policyholders . . . on the date of record* will be eligible to receive the membership credit when their policies renew during the membership credit period." (emphasis added). Unlike the cases cited by the dissent, the board here clearly set a record date that was different from the declaration date. In fact, the corporate board in *Spence v. Medical Mutual Liability Insurance Society of Maryland,* 500 A.2d 1066, 1067 (Md. Ct. Spec. App. 1985) emphasized the date of record and not the declaration date as the operative date of the distribution. As we noted above, the record date defines the set of policyholders entitled to the distribution and the timing of the distribution, *i.e.*, setting the record-date, is protected by the "business judgment rule," a point conceded by Factory Mutual.

15

dividend."); *Cohen,* 121 F.2d at 349 (noting that the company incurred its liability to pay dividends on the declaration date to the stockholders "of record"). *See generally* BLACK'S LAW DICTIONARY 423 (8th ed. 2004)(defining "record date" to mean the "[t]he date on which a stockholder must own shares to be entitled to vote or receive a dividend. -- Also termed *date of record*"). The relevant state statutes also emphasize the importance of the "record date" as the operative date to ascertain the stockholders of record for a capital distribution in stock corporations. *See* TEX. BUS. CORP. ACT ANN. art. 2.26 (describing the record date as determining which shareholders have rights to a stock dividend); R. I. GEN. LAWS § 7-1.2-614(a)(2) (same). Accordingly, the record date is the effective date to determine which stockholders can partake in the distribution even though the company accrues its liability to pay the announced distribution to those stockholders of record on the declaration date. *See, e.g.*, *Cohen*, 121 F.2d at 349. In accordance with these general principles and the complete analogy, as to the right to receive surplus distributions, between stockholders and mutual insurance policyholders, Kimberly-Clark, as a policyholder of good-standing on the record date, was entitled to participate in the distributed surplus.

Factory Mutual's final argument against according Kimberly-Clark its share is based on the fact that Kimberly-Clark did not renew its policy before it expired, which the board had established as a condition precedent for participating in the distribution. The Kentucky Court of Appeals and a New York court, the only courts to directly confront this issue, barred the conditioning of surplus distributions on future renewal by relying on the general principles underlying mutual insurance we described above. *See Mut. Ben. Liab. Ins. Co. v Davis*, 73 S.W. 1020, 1021 (Ky. Ct. App. 1903); *Wells v. Metro. Life Ins. Co.,* 13 N.Y.S.2d 22, 25-26 (N.Y. City Ct. 1939); *see also Aetna Liab. Ins. Co. v Hartley*, 67 S.W. 19, 21, *opinion modified on other grounds*, 68 S.W. 1081 (Ky. Ct. App.

16

1902). We agree with these authorities.[8] As we noted earlier, once a surplus distribution is announced, the policyholders on the record date own the surplus and the corporate board no longer has any rights or interests in the distributed amounts. Accordingly, Kimberly-Clark, as a policyholder of record, owned a share of the surplus, and Factory Mutual cannot then disentitle Kimberly-Clark based its subsequent failure to renew its policy -- presumably, Kimberly-Clark could have changed its mind and decided to renew its policy on October 1, which

---

[8] Factory Mutual cites *Bryant v. Mutual Benefit Life Insurance Co.,* 109 F. 748, 756 (M.D. Tenn. 1901), and *Petrie v. Mutual Benefit Life Insurance Co.,* 100 N.W. 236, 238-39 (Minn. 1904), as espousing opposing positions, i.e., permitting mutual insurance companies to condition distributions on renewal. We disagree with Factory Mutual's reading of those cases. The corporate board in each case conditioned a surplus dividend on a future premium payment because the policyholder was in arrears. In other words, the policyholders in those cases were not members "in good standing" and therefore not on equal footing with other members who actually contributed to the capital surplus and were therefore entitled to an equitable share. *E.g.*, *Wells,* 13 N.Y.S.2d at 25. In *Bryant*, the court allowed a mutual company to refuse to credit an anticipated dividend before *that same* year's contribution was paid. *See Bryant,* 109 F. at 755-57. In *Petrie,* the Minnesota court similarly permitted the corporate board to only apply a dividend credit to the policyholder's delinquent account if the policyholder paid the premium due in the year of the dividend. 100 N.W. at 239. In both cases, the policyholders loaned from the mutual company against their policy and were in arrears; the policyholders were thereby borrowing against and depleting the company's capital stock. *See Bryant,* 109 F. at 749-50; *Petrie,* 100 N.W. at 237-38. In such circumstances, a mutual company, consistent with its general principles, can condition the policyholder's right to anticipated dividends on the payment of existing debts and policy renewal, because dividends derive from accumulated contributions and excess capital stock; in other words, the past failure to pay those contributions and the taking out of loans that deplete the capital stock can justify the adjustment of those members' *equitable* right to a dividend distribution unless they promise to pay premiums that reduce their debt to the capital stock. *See* RUSS & SEGALLA, COUCH ON INSURANCE § 77:7 (citing *Bryant*, 109 F. at 748; *Petrie*, 100 N.W. at 236). It is undisputed that Kimberly-Clark was a policyholder in good standing on the record date and had contributed to the accumulated capital stock. Therefore, these cases are inapposite.

Factory Mutual also references an unpublished memorandum order from a district court in Ohio for further support. *See Andersons, Inc. v. Factory Mut. Ins. Co.,* No. 3:01 CV 7620 (Memorandum Opinion) (N.D. Ohio Sept. 3, 2003) (unpublished).Not only is this unpublished order's precedential value limited, it does not provide any reasons for its conclusion that Factory Mutual's membership credit program is a "unilateral contract." It also does not consider the fact that Factory Mutual is a mutual insurance company. For these reasons, the order is not persuasive.

17

is after the distribution's record date. As a practical matter, Factory Mutual's eligibility rules effectively bar any return of excess capital to members on the record date who no longer need insurance or cannot afford to renew their insurance, thereby directly contravening members' equitable rights to a distribution from a surplus that was created, in part, by their past contributions. Conditioning a right to a distribution on renewal would add a new condition to the policy that substantially limits and encumbers a policyholder's rights to a surplus distribution without any contractual basis and undermines the settled expectation that mutual insurance provides insurance "at cost."

In this case, Factory Mutual declared a $325 million distribution from excess surplus funds as a return to policyholders and it apportioned the distribution based on the policyholders' contribution to the accumulated capital stock, i.e., their past premiums. Factory Mutual segregated this amount from its capital stock on October 9, 2003, for existing policyholders of the record date: September 30, 2003. Once Factory Mutual's corporate board segregated the $325 million from the surplus and marked it for distribution to existing members on the record date, those existing members became entitled to the whole amount based on their equitable share as calculated pursuant to the board's formulas. The corporate board also became liable to follow through with the distribution on the date of declaration. Furthermore, after declaring the surplus, the board could not then condition a policyholder's right to a share of the distribution on a future, post-record-date act, such as policy renewal, because the board no longer had any competing interests or rights to the distribution funds. Since Kimberly-Clark was a policyholder on the record date, it equitably owns a share of the distribution calculated pursuant to the board's formula whether or not it had renewed its policy before the policy's expiration. Therefore, the district court properly awarded Kimberly-Clark its properly calculated share of the

18

distribution.

For these reasons, we AFFIRM the district court's judgment.

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent. It is undisputed that Kimberly-Clark's only relevant Factory Mutual policy expired by its terms on September 30, 2003, that prior to that time Kimberly-Clark had determined not to renew the policy, so informing Factory Mutual in late August 2003, and that Kimberly-Clark never attempted to renew the policy. On October 9, 2003, after the Kimberly-Clark policy had indisputably expired, the Factory Mutual's Board of Directors declared a some $325 million surplus all of which would be credited to policyholders as of September 30, 2003 as a reduction of the premium payable on the renewal of their policy. As Kimberly-Clark's policy had already expired, and there was never any attempt to renew it, Kimberly-Clark received nothing by virtue of the October 9, 2003 board action, but nevertheless claims an entitlement to a share of the $325 million surplus.

Kimberly-Clark's relevant policy expressly states that it is subject to the terms of the Charter of Factory Mutual. Section 5 of the Charter provides that a policyholder of the corporation "shall be a member of the Corporation during the term of its policy, but no longer," and section 10 of the Charter states that "upon termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease." There is no evidence that these Charter provisions ever read otherwise at any relevant time, nor has their validity been challenged in this case. For example, in *Zinn v. Germantown Farmers' Mutual*, 111 NW 1107 (Wis. 1907), a mutual insurance company on March 19, 1906 declared a $50,000 surplus to be distributed to members "entitled thereto." It was held that *only* those who were *policyholders on March 19, 1906* – the date the surplus was declared and ordered distributed – were entitled to participate, specifically excluding, *inter alia*, those "who had held

20

policies and contributed toward the surplus, but whose policies had lapsed and expired, and who were not policyholders on March 19, 1906." *See also, e.g., Spence v. Medical Mut. Liab. Ins. Soc'y of Maryland*, 500 A2d 1066, 1067 (Md. App. 1985) ("*former* policyholders of a mutual company . . . are *not* entitled to participate in the distribution of a dividend from earned surplus stemming from a year from which they had policies in effect." (emphasis added)); Russ & Segalla, 3 Couch on Insurance (2005) § 39.40 ("The right to share in surplus may, however, be restricted to current policyholders.").

This is not to suggest that charter provisions such as those of section 5 and 10 of the Factory Mutual Charter *must* be included in every mutual insurance company's charter. A charter which does not include such provisions would likely not *thereby* be invalid. However, it strains logic well past the breaking point to suggest, as does the majority in its footnote 7, which simply ignores section 10 of the Charter and misreads section 5, that once the choice is made to include such provisions in the charter of a mutual insurance company, its Board of Directors is thereafter free to disregard them.

At no time since September 30, 2003, has Kimberly-Clark been a member of Factory Mutual. Consequently, Kimberly-Clark was entitled to no share of the distribution of surplus provided for in the October 9 Board resolution. The Board had no power to itself amend the Factory Mutual Charter, and did not purport to do so. On October 9, the Factory Mutual Board could have declared a surplus distribution payable to, and only to, all who were members on that date, which would have included nothing for Kimberly-Clark.

The fact that Factory Mutual conditioned receipt of the surplus distribution on policy renewal, providing the distribution be only a credit on

21

the renewal premium, is nothing of which Kimberly-Clark has any right to complain, because it had no right to *any* distribution of any of the surplus.

Kimberly-Clark was not a member on October 9, 2003, and was entitled to no part of the surplus determined to then exist and then ordered to be distributed, and it has not been a member at any time since September 30, 2003, and thus its rights were not in any way infringed by the Board resolution of October 9, 2003.

I accordingly respectfully dissent.